UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| CHAPEL DOME, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) CIVIL ACTION NO. 1:18-CV-971 |
| ACCELAVUE, INC., | ) |
| | ) |
| Defendant. | ) |

# COMPLAINT

1. This lawsuit arises out of the defendant AccelaVue, Inc.'s ("AccelaVue") breach of its contract with the plaintiff Chapel Dome, LLC ("Chapel Dome"). Under this contract, AccelaVue promised to share with Chapel Dome a portion of revenues received by AccelaVue from Charter Communications, Inc. ("Charter") for staffing services Chapel Dome assisted AccelaVue in providing to Charter. After making monthly payments under the contract for nearly a year, AccelaVue stopped paying. Chapel Dome states claims for breach of written contract and alternatively, for breach of oral contract and alternatively, for quantum meruit.

## THE PARTIES

2. Chapel Dome is a limited liability company organized under the laws of New York with a place of business in Great River, New York. Cliff Hagan ("Hagan") and his wife Cindi Hagan née Guthrie, residents of Great River, New York, are the sole members of Chapel Dome.

3. AccelaVue is a corporation organized under the laws of Texas with its principal place of business at 6900 Ligustrum Cove, Austin, Texas. John Greening ("Greening"), a

resident of Austin, Texas, is the president of AccelaVue. On information and belief, Greening is the sole owner of AccelaVue.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5. Venue is proper in this District pursuant to 28 U.S.C. § 1391.

## FACTUAL BACKGROUND

6. Hagan and Greening met each other in 1995 as employees of a company called Arrowsmith.

7. From approximately 1996 through March of 2013, Hagan worked as an executive at Cablevision Systems Corporation ("Cablevision").

8. In approximately late 2013, Hagan was considering starting his own consulting business and approached Greening, with whom he had kept in touch over the years, to discuss his ideas for such an enterprise. At that time, Greening was operating AccelaVue and providing certain project management staffing services to Atlantic Broadband.

9. Hagan formed Chapel Dome in or about April 2014.

10. At this time, numerous former colleagues of Hagan at Cablevision were working at Charter as senior executives. Hagan has and continues to have longstanding relationships of trust and confidence with these executives. Hagan and Greening discussed the prospect of leveraging Hagan's knowledge of Charter's business "play book" and relationships with Charter senior executives to assist AccelaVue in placing workers (referred to by AccelaVue as "resources") at Charter.

11. In or about July 2014, Chapel Dome and AccelaVue agreed that Chapel Dome would assist AccelaVue in providing staffing services to Charter in exchange for a percentage of profits received by AccelaVue. More specifically, the parties agreed that Chapel Dome would assist AccelaVue by taking advantage of Hagan's trusted relationships with Charter senior executives, his knowledge of their staffing needs and working styles, and his extensive knowledge of the industry to offer Charter a better value proposition through engaging pre-vetted AccelaVue resources to fill Charter's needs, instead of relying on the many consulting companies that were already working at Charter. In exchange, AccelaVue agreed to pay to Chapel Dome 50% of the "net margin" realized by AccelaVue from providing the staffing services to Charter. Chapel Dome and AccelaVue agreed that the net margin would be the gross revenue received by AccelaVue from Charter on account of resources that Chapel Dome assisted in placing, less a 5% fee to AccelaVue, less certain direct costs incurred by AccelaVue associated with placing the resources.

12. Under their agreement, Chapel Dome identified needs for multiple workers at Charter, and worked closely with Charter to find AccelaVue resources to fill specific contracting needs, while AccelaVue located qualified resources, placed them at Charter, employed and paid them, and handled billings to and collections from Charter for their services. Both Chapel Dome and AccelaVue vetted these resources together before placement. This work resulted in several resources being placed in St Louis and Denver.

13. In the Fall of 2014, an executive at Charter, with whom Hagan had worked at Cablevision, reached out to Hagan about the possibility of Hagan personally providing consulting services to Charter to evaluate Charter's enterprise resource planning (ERP) strategy.

14. Hagan and Greening then discussed a separate arrangement whereby AccelaVue would place Chapel Dome at Charter as a consultant under an AccelaVue Statement of Work.

15. In or about August 2014, AccelaVue placed Chapel Dome as a consultant at Charter, and Chapel Dome began providing consulting services to Charter. The placement entailed, among other things, AccelaVue's billing Charter for Chapel Dome's services, AccelaVue's retaining 5% of its collections from Charter as a fee, and AccelaVue's payment of the balance to Chapel Dome.

16. Before contracting with Chapel Dome, AccelaVue did not have any material contacts at Charter and had not made any placements of contractors or employees there.

17. In mid-2015, Charter offered Hagan a position as a full-time employee to lead its Integration Management office and Hagan accepted.

18. Because Hagan was transitioning from consultant to employee at Charter, he determined that, in keeping with his duties to Charter, he could no longer assist AccelaVue in maintaining resources and placing new resources at Charter. Thus, Hagan discussed with Greening a potential modification to the general placement agreement between Chapel Dome and AccelaVue. More specifically, Hagan and Greening discussed a modification whereby Chapel Dome would continue to receive payments, at a reduced rate, on account of the AccelaVue resources that Chapel Dome had already assisted in placing at Charter. In other words, they discussed "grandfathering in" the existing resources to the extent AccelaVue would continue to realize revenue from their services (and thus continue realizing benefits from Chapel Dome's past efforts), and ending Chapel Dome's assistance in maintaining those resources at Charter or assisting AccelaVue in placing new resources at Charter.

19. Hagan and Greening sought and obtained approval of Charter for this potential amendment to the agreement. More specifically, Hagan and Greening disclosed the new planned arrangement to Charter's EVP of Business Planning James Nuzzo ("Nuzzo"). Nuzzo represented to Hagan and Greening that the agreement would not present a conflict of interest and was otherwise acceptable to Charter. Hagan promptly thereafter discussed the new planned arrangement Charter's General Counsel Richard Dykhouse ("Dykhouse"). Dykhouse also represented that the new proposed agreement would not present a conflict of interest and was otherwise acceptable to Charter.

20. Based on the discussions between Hagan and Greening, and in light of Nuzzo's and Dykhouse's approval, AccelaVue forwarded to Chapel Dome a written agreement, titled "Subcontractor Agreement," dated June 15, 2015 (the "Subcontractor Agreement"), which Chapel Dome accepted and agreed to. The Subcontractor Agreement is a written contract embodying the modification, that Hagan and Greening had been discussing, to the then existing agreement between Chapel Dome and AccelaVue. A true copy of the Subcontractor Agreement is attached as Exhibit A.

21. Under the Subcontractor Agreement, AccelaVue agreed to make monthly payments (referred to as "residuals") to Chapel Dome in the amount of 25% of the net margin realized by AccelaVue for twelve specified individuals (referred to as the "Named Resources") who were originally placed at Charter through the connections and efforts of Hagan for Chapel Dome. The Subcontractor Agreement provides that it will "remain in effect as long as [the Named Resources] … are working at Charter Communications." (*See* Subcontractor Agreement, § 2.) The Subcontractor Agreement does not provide that if any of the Named Resources leaves

a project and starts another at Charter that AccelaVue is relieved of further payment obligations to Chapel Dome with respect to that resource.

22. Although neither AccelaVue nor Chapel Dome signed the Subcontractor Agreement, AccelaVue demonstrated its unconditional assent to the Subcontractor Agreement by presenting it as an offer to Chapel Dome without qualification, and by performing under it for nearly a year by making monthly payments to Chapel Dome on account of revenues received from Charter for the Named Resources, and Chapel Dome demonstrated its unconditional assent to the Subcontractor Agreement by accepting the benefits thereunder.  Accordingly, the Subcontractor Agreement constitutes a written agreement between AccelaVue and Chapel Dome.

23. In mid-2016, Greening notified Hagan that AccelaVue needed the assistance of one of the Named Resources to (a) assist in maintaining placements of the Named Resources at Charter, and (b) assist in making further placements of any Named Resources at Charter after they had experienced any break in service.  Greening asked Hagan whether AccelaVue could calculate "net margin" under the Subcontractor Agreement by deducting from the amounts collected from Charter the marginal cost associated with this worker's efforts in connection with the Named Resources only.  Chapel Dome agreed to this modification of the Subcontractor Agreement, but did not agree to any others.

24. In May 2016, even though AccelaVue had performed under the Subcontractor Agreement for nearly a year and had never indicated in any way that it was somehow invalid or non-binding, and even though Nuzzo and Dykhouse had approved the arrangement, Greening notified Hagan that his lawyer said the agreement presented a conflict of interest between Hagan and Charter, and would have to be wound down as a result.

25. The Agreement may be terminated only upon certain specified events, none of which has occurred. (*See* Subcontractor Agreement, § 3.)

26. AccelaVue made a partial payment to Chapel Dome under the Subcontractor Agreement for June 2016 and has not made any payments to Chapel Dome since.

27. Recently, AccelaVue has taken the position that there was no "meeting of the minds" between Chapel Dome and AccelaVue on the terms of the Subcontractor Agreement. This despite AccelaVue's unqualified performance thereunder for nearly a year.

28. AccelaVue continues to receive revenues from Charter on account of some or all of the Named Resources. Additionally, having obtained a "foot in the door" at Charter as a result of Hagan's connections and efforts, AccelaVue has placed additional resources at Charter and has profited further as a result.

## COUNT ONE
## BREACH OF WRITTEN CONTRACT

29. Chapel Dome repeats and realleges, as if fully set forth at this point herein, the allegations contained in all the preceding paragraphs.

30. The Subcontractor Agreement is a valid and enforceable written contract supported by good and adequate consideration.

31. By its actions, as set forth above, AccelaVue has breached and is continuing to breach the Subcontractor Agreement.

32. Chapel Dome has sustained, and is continuing to sustain, significant damages as a result of AccelaVue's breach of the Subcontractor Agreement.

## COUNT TWO
## (CLAIM IN THE ALTERNATIVE)
## BREACH OF ORAL CONTRACT

33. Chapel Dome repeats and realleges, as if fully set forth at this point herein, the allegations contained in all the preceding paragraphs.

34. If the Court or Jury determines that the Subcontractor Agreement does not constitute a written agreement between the parties, then AccelaVue and Chapel Dome entered into an oral agreement on or about June 15, 2015 (the "Oral Agreement"), the material terms of which are identical to the material terms of the Subcontractor Agreement.

35. The Oral Agreement is a valid and enforceable contract supported by good and adequate consideration.

36. By its actions, as set forth above, AccelaVue has breached and is continuing to breach the Oral Agreement.

37. Chapel Dome has sustained, and is continuing to sustain, significant damages as a result of AccelaVue's breach of the Oral Agreement.

## COUNT THREE
## (CLAIM IN THE ALTERNATIVE)
## QUANTUM MERUIT

38. Chapel Dome repeats and realleges, as if fully set forth at this point herein, the allegations contained in all the preceding paragraphs.

39. If the Court or Jury determines that the Subcontractor Agreement and Oral Agreement are not valid and enforceable contracts supported by good and adequate consideration, then in the alternative to Chapel Dome's claims for breach of contract, Chapel Dome is entitled to recovery in quantum meruit.

40.     In aiding in the placement of the Named Resources at Charter, Chapel Dome rendered valuable services to AccelaVue.

41.     Such services were accepted and enjoyed, and are still being enjoyed, by AccelaVue.

42.     Chapel Dome rendered the services in such circumstances as reasonably notified AccelaVue that Chapel Dome was expecting to receive payment for them from AccelaVue.

43.     AccelaVue has failed and refused to make payment to Chapel Dome for these services.

44.     AccelaVue's non-payment for the services rendered by Chapel Dome has resulted, and is continuing to result, in unjust enrichment to AccelaVue.

## PRAYER FOR RELIEF

**WHEREFORE**, Chapel Dome prays that this Court enter judgment as follows:

A.     Award Chapel Dome an amount of damages to be determined at trial;

B.     Under Count I or II, award Chapel Dome its reasonable attorney's fees pursuant to Tex. Civ. Prac. & Rem. Code Ann. § 38.001(8);

C.     Award Chapel Dome the costs and expenses it incurs in connection with this action;

D.     Award Chapel Dome interest at the statutory rate; and

E.     Award Chapel Dome such other relief as may be deemed just and equitable.

## **JURY DEMAND**

Chapel Dome demands a trial by jury on all matters and issues triable by a jury.

                Respectfully submitted,

                CHAPEL DOME, LLC

                By its attorneys,

                /s/ _____
                William Christian
                Texas State Bar No. 00793505
                wchristian@gdhm.com
                GRAVES, DOUGHERTY, HEARON & MOODY, P.C.
                401 Congress Avenue, Suite 2200
                Austin, Texas 78701
                (512) 480-5600
                (512) 480-5804 (facsimile)

                Frank N. Gaeta
                *Pro Hac Vice* application forthcoming
                RICH MAY, P.C.
                176 Federal Street
                Boston, MA  02110
                (617) 556-3800
                fgaeta@richmaylaw.com

November ____, 2018